553 F.2d 398
 21 UCC Rep.Serv. 929
 PERINI CORPORATION and Brown Brothers, Harriman and Company,
Plaintiffs- Appellants,
v.
The FIRST NATIONAL BANK OF HABERSHAM COUNTY, GEORGIA, the
Fulton National Bank of Atlanta, Georgia and
Morgan Guaranty Trust Company of New
York, New York, Defendants-Appellees.
PERINI CORPORATION and Brown Brothers, Harriman and Company,
Plaintiffs- Appellants,
v.
The FIRST NATIONAL BANK OF HABERSHAM COUNTY, GEORGIA, and
the Fulton National Bank of Atlanta, Georgia,
Defendants-Appellees.
 Nos. 75-2816, 75-3402.
 United States Court of Appeals,
Fifth Circuit.
 June 2, 1977.
Rehearing and Rehearing En Banc Denied July 27, 1977.
 
 Edward E. Dorsey, Frank Mays Hull, John T. Marshall, Atlanta, Ga., William F. Willier, Newton Center, Mass., Frederick M. Hart, Albuquerque, N. M., for plaintiffs-appellants.
 Barry Phillips, Richard Cheatham, Atlanta, Ga., for Fulton.
 King & Spalding, Atlanta, Ga., Charles H. Willard, Phillip C. Potter, Sheila McMeen, New York City, for Morgan Guaranty Trust Co. in No. 75-2816.
 Charles H. Kirbo, Walter Driver, Atlanta, Ga., for Morgan Guaranty Trust Co. in Nos. 75-2816 and 75-3402.
 Albert E. Phillips, Atlanta, Ga., for First Nat. Bank, etc. in Nos. 75-2816 and 75-3402.
 J. Alexander Porter, Atlanta, Ga., Henry J. Bailey, III, Salem, Or., William D. Hawkland, Champaign, Ill., for First Nat. Bank, etc. in No. 75-3402.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before GOLDBERG, MORGAN and HILL, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This tale of intrigue offers a series of complex commercial paper conundrums. Seventeen forged checks bearing arguably ineffective indorsements plunge us into the debate over a centuries-old yet hardly refined distinction between cases of forged drawer's signatures and forged indorsements. This distinction the Uniform Commercial Code has carried forward somewhat uneasily, in only partial fulfillment of the drafters' professed desire to dissipate any clouds of potential liability as soon as possible after a check transaction's dawn.
 
 
 2
 A forger drew the checks before us to the order of two companies that were in all likelihood, though not certainly, fictitious. A man claiming a connection with the companies indorsed the checks, but did so in an individual rather than representative capacity. We shall ultimately conclude that the loss occasioned in these unusual circumstances must be viewed as a forged check loss, the label used in forged drawer's signature cases. Moreover, we find that the challenged indorsements not only failed to lead to liability in their own right, but also failed to work any change in the rules for determining forged check liability.
 
 
 3
 Upon these conclusions we will affirm the action of the district court. This disposition leaves appellant, which for its own reasons forfeited the law's chief protection against forged check losses, with only a narrowly circumscribed action against the depositary bank. Before we engage the hazards of further explanation, however, both factual and legal terrain merit a detailed survey.
 
 I. Factual and Procedural Background
 
 4
 We commence by introducing the principal characters caught in the unfortunate and mysterious set of occurrences that spawned this dispute. Plaintiff Perini Corporation (hereinafter Perini) is a large construction company with offices located in Framingham, Massachusetts. At all times with which we are concerned, Perini maintained checking accounts with plaintiff Brown Brothers, Harriman & Company (hereinafter Brown Brothers) and with defendant Morgan Guaranty Trust Company of New York, New York (hereinafter Morgan), both large New York banking institutions. Brown Brothers and Morgan are the drawees of the checks here at issue.
 
 
 5
 Those checks were deposited in accounts at defendant First National Bank of Habersham County, Georgia (hereinafter Habersham). With $23 million total assets in 1971, Habersham was an institution of modest size on a national scale, but the largest bank serving the north Georgia mountain county.
 
 
 6
 The remaining party to this litigation is the defendant Fulton National Bank of Atlanta, Georgia (hereinafter Fulton). As Habersham's correspondent bank in Atlanta, Fulton received the nefarious drafts from Habersham and forwarded them along their heated trail to the New York bankers.
 
 
 7
 To complete this roster for the enlightenment and enjoyment of the commercial law fan, we must introduce a character who, while not a party to the litigation, appears at present to be its only real winner. Known to the treatises and commentaries as Malefactor, Wrongdoer, and the like, he chose in this case to be called Jesse Quisenberry. Like the parties to the litigation and the court below, we do not know whether that was actually his name, but for want of a more reliable moniker we shall employ it throughout this opinion. Eschewing the tommy gun and the Model T for more peaceable means of relieving others of their money, Quisenberry is the antiheroic fellow who deposited the checks at Habersham and withdrew the amounts in cash, thence to vanish. But for the telling of the story we must return to the corporate offices of Perini.
 
 
 8
 Perini's extensive construction activities require it to issue a voluminous amount of checks. Accordingly, it has long utilized a facsimile signature machine for writing many of those checks. The use of such machines is a widely encountered and accepted lubricant for the modern wheels of commerce.
 
 
 9
 That lubricant, however, does not come free. In June 1969 Perini adopted a corporate resolution authorizing and directing four banks, including Brown Brothers and Morgan,
 
 
 10
 to honor all checks, drafts or other orders of payment of money drawn in the name of Perini Corporation on its Regular Accounts . . . when bearing or purporting to bear the single facsimile signature of R. A. Munroe. . . . said banks shall be entitled to honor and charge Perini Corporation for all such checks, . . . regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such facsimile signature resembles the facsimile specimen from time to time filed with said banks . . . .
 
 
 11
 In effect at all times relevant to this litigation, this assumption of risk was the price Perini undertook to pay, voluntarily and at arms length, for the convenience of the facsimile signature machine.
 
 
 12
 The precautions taken by Perini to safeguard against abuse of the machine are much in dispute. Pre-printed company checks may or may not have been left in an unlocked cabinet. Operation of the machine itself required three different keys, but Perini may or may not have kept those keys in separate hands.
 
 
 13
 In any event, sometime prior to September 7, 1971, someone stole a number of pre-printed Perini checks and gained access to the signature machine or developed a perfect copy of the facsimile signature it produced. On September 7, Jesse Quisenberry, or his facsimile, appeared at Habersham and opened an account in the name of "Quisenberry Contracting Co." He signed "Jesse D. Quisenberry" on a signature card used for sole proprietorships, but no one at the bank then or later actually determined that Quisenberry Contracting Co. was a sole proprietorship.
 
 
 14
 From a period beginning that day and extending through September 16, Quisenberry deposited in this account eight checks in the total amount of $536,075.99. These were pre-printed Perini checks, drawn on Brown Brothers and payable to "Quisenberry Contracting Co." In the space for the drawer signature on each check was the facsimile signature of R. A. Munroe, indistinguishable from the specimen Perini had placed on file with its drawee banks. In a pen stroke responsible for if nothing else, the complexity of this opinion, Quisenberry indorsed the checks in a personal, not a representative, capacity, signing simply "Jesse D. Quisenberry."
 
 
 15
 Quisenberry shortly began to make large cash withdrawals from the account. Beginning with a $46,000 withdrawal on September 16, by September 19 he had extracted $533,707.90 in cash from the "Quisenberry Contracting Co." account, almost entirely depleting it.
 
 
 16
 During this period Quisenberry opened and made deposits in another account at Habersham in the name of "Southern Contracting Co." Again he signed his name on a sole proprietorship signature card, although it was never established that the company was a sole proprietorship. From September 18 to September 25, he deposited in this account nine pre-printed Perini checks in the aggregate sum of $593,156.30, drawn on Morgan and payable to "Southern Contracting Co." These checks too contained a facsimile signature of R. A. Munroe indistinguishable from that on file with Perini's drawee banks. Again Quisenberry indorsed the checks simply "Jesse D. Quisenberry." By October 1, Quisenberry's cash withdrawals had reduced this account to little over a thousand dollars.
 
 
 17
 As the checks were deposited, Habersham provisionally credited them to the accounts of the respective payees. On the back of each the bank stamped "P.E.G.", guaranteeing prior indorsements.[1] On ten of the checks Habersham also stamped "Credit to the Account of the Within Named Payee in Accordance with Payee's Instructions Absence of Endorsement Guaranteed."
 
 
 18
 Habersham forwarded each check to Fulton for collection. Fulton then sent each to the drawee bank, either directly or through the Federal Reserve. Upon presentment, Brown Brothers and Morgan paid the checks. In late October Perini received notice that its accounts at Brown Brothers and Morgan were overdrawn. Subsequent investigation disclosed the unauthorized checks to "Quisenberry Contracting Co." and "Southern Contracting Co.", entities with which Perini had never dealt and of which it had no knowledge.
 
 
 19
 How Quisenberry executed his maneuvers of deposit and withdrawal at Habersham is a stratagem shrouded in much mystery. Deposits and withdrawals of this magnitude were uncommon to Habersham; few checking accounts there maintained balances in excess of $200,000. Despite the size of Quisenberry's transactions and his being a stranger to the bank, no one at Habersham ever asked him to verify his identity or that of the businesses he purported to represent. As if this were not suspicious enough, appellant Perini places Quisenberry at Habersham regaled in "mod" clothes, high-heeled shoes, wire-rimmed glasses, a "Fu Manchu" mustache attached by tape that became visible on one occasion, and an "unusual" northern or western accent.
 
 
 20
 While contemporary politics suggest that a regional accent tells only little about the man, it will be seen that the "unusual" accent, along with the mystery of the Fu Manchu, need not presently concern this court. For our purposes we need only note that, as is the case with the issue of Perini's care in handling its facsimile signature machine, there is a substantial dispute regarding the caution and good faith with which Habersham allowed Quisenberry to effect his transactions.
 
 
 21
 One final, discrete element of this tale needs telling. Quisenberry did provoke the curiosity of one Habersham employee, vice-president Claude Surface. On September 17, 1971, Surface telephoned Fulton's credit department and requested that someone check on Jesse D. Quisenberry d/b/a Quisenberry Contracting Co., whom Surface described as a potential loan customer. Fulton could find no evidence of such a business. Neither the telephone book nor the city directory listed a Quisenberry Contracting Co. No business at all was operating at the Atlanta address Quisenberry had given Habersham.
 
 
 22
 Fulton's credit department informed Surface on September 20 that it had been unable to obtain any information about Quisenberry or Quisenberry Contracting Co. As was its customary practice regarding such inquiries, the credit department did not transmit this information to Fulton's transit department, which processes all checks that are cleared through the bank.
 
 
 23
 The painful upshot of these events was that Perini felt seventeen drafts that left it $1,125,000 in the cold. Perini brought the three defendant banks, Morgan, Fulton, and Habersham, to the court below, where it fired a deafening volley of statutory and common law claims regarding the payment and handling of the checks.[2]
 
 
 24
 Following lengthy discovery, the district court granted summary judgment in favor of Morgan Guaranty and Fulton on all counts. It entered final judgment for these defendants. See Fed.R.Civ.P. 54(b). The court below also granted Habersham's motion for summary judgment on several counts, but denied it on the statutory claims for negligence and breach of warranty.
 
 
 25
 Plaintiffs appealed the final judgments in favor of Morgan and Fulton. The district court certified that the partial summary judgment order in Habersham's favor merited interlocutory review, and this court granted leave to appeal that order pursuant to 28 U.S.C. § 1292(b). We consolidated these appeals.
 
 
 26
 II. The Uniform Commercial Code and Forgery Losses
 
 
 27
 This case illustrates the unwisdom of the belief that codification provides the yellow brick road to juridical certainty. Unimaginable circumstantial concatenations and scientific innovation very often outrun the fixity of a codified consensus. Such is emphatically the situation this court faces today.
 
 
 28
 The case at bar presents an unusual, fortuitous combination of circumstances: checks bearing undisputedly forged drawer's signatures accompanied by indorsements that may be legally defective because made in a personal capacity without indication of authority to indorse for the named payee businesses, indorsements that may or may not also have been forged, i. e., falsely written. This unique juxtaposition of factors creates numerous and vexing questions relating to the Uniform Commercial Code allocation of forgery losses among the various parties to checks and the check collection process.[3]
 
 
 29
 One answer is clear, however. Perini has no recourse on the unauthorized signature of R. A. Munroe against Morgan or Brown Brothers. Perini's resolution authorizing the drawees' payment of checks bearing signatures resembling the machine-embossed facsimile signature precludes that course of action.
 
 
 30
 Perini makes no contrary contention. Rather, it offers claims on this appeal that rest in one way or another on asserted defects in the indorsements signed by Quisenberry.[4] The checks were made payable to "Quisenberry Contracting Co." or "Southern Contracting Co."; each was indorsed simply "Jesse D. Quisenberry." As will be seen, if liability may be rested on these indorsements, none of the appellee banks were entitled to summary judgment. If not, the trial court's action was proper. Further explanation of the controversies created by this indorsement however, must be preceded by a sketch of the general UCC scheme dealing with forged and unauthorized signatures on checks and of the policies said to underlie that scheme.[5]
 
 A. The Code Framework
 
 31
 Perpetuating a distinction introduced into the legal annals by Lord Mansfield in the eighteenth century, the Code accords separate treatment to forged drawer signatures (hereinafter "forged checks") and forged indorsements. In general, the drawee bank is strictly liable to its customer drawer for payment of either a forged check or a check containing a forged indorsement. In the case of a forged indorsement, the drawee generally may pass liability back through the collection chain to the party who took from the forger and, of course, to the forger himself if available. In the case of a forged check, however, liability generally rests with the drawee. The patchwork of provisions from which this general allocation of liability emerges merits more detailed description.
 
 1. Forged Indorsements
 
 32
 A check bearing a forged indorsement, included in the § 1-201(43) definition of unauthorized signatures,[6] is not "properly payable". J. White and R. Summers, Uniform Commercial Code 559 (1972).[7] Regardless of the care exercised, a drawee bank is with few exceptions liable to its drawer customer for payment of such a check. See § 4-401.
 
 
 33
 Upon recrediting the drawer's account after payment over a forged indorsement, the drawee will seek redress against prior parties in the collection chain through an action for breach of the statutory warranty of good title. Each person who obtains payment of a check from the drawee and each prior transferor warrants to the party who in good faith pays the check that he has good title to the instrument. §§ 3-417(1)(a), 4-207(1)(a).[8] A forged indorsement is ineffective to pass title; see § 3-417, Comment 3. The drawee may therefore bring a breach of warranty action against a person who presented a check bearing a forged indorsement. These warranty actions will continue up the collection chain to the party who took from the forger or to the forger himself.
 
 
 34
 Additionally, payment of a check bearing a forged indorsement constitutes conversion under § 3-419(1)(c). This conversion action at least provides the check's "true owner," the payee or indorsee from whom it was stolen and whose name was falsely indorsed, direct relief from the drawee. See White and Summers, supra, 500. Without the conversion action the true owner would have to seek payment from the drawer, who might be overcautious and unaware of his right to force the drawee to recredit his account for any payment over a forged indorsement.
 
 
 35
 The danger created by forged indorsements is that the party designated by the instrument as entitled to its proceeds will appear with a claim to those proceeds after payment has been made to the malefactor. The statutory actions for improper payment, conversion, and breach of warranty of good title combine, however inartfully, to safeguard the drawer against double liability and to assure the payee of payment. The loss falls on the party who took the check from the forger, or on the forger himself.
 
 2. Forged Checks
 
 36
 As opposed to diverting an intended payment to someone other than the intended recipient, forged checks present the problem of depleting the ostensible drawer's funds when he had intended no payment. The Code's treatment of forged checks, however, begins in the same place as its treatment of forged indorsements. The forgery does not operate as the ostensible drawer's signature. See § 3-404(1). Payment consequently is not to the ostensible drawer's order and violates the drawee bank's strict duty to charge its customer's account only for properly payable items. See § 4-401(1).
 
 
 37
 The Code's analysis of forged check liability not only begins with the drawee, however; it also generally ends there. The drawee's payment of a forged check is final in favor of a holder in due course or one who has relied on the payment in good faith. § 3-418. This final payment rule codifies and attempts to clarify the rule of Price v. Neal, 3 Burr. 1354 (K.B.1762), "under which a drawee who accepts or pays an instrument on which the signature of the drawer is forged is bound on his acceptance and cannot recover back his payment." § 3-418, Comment 1. Prior parties in the collection chain who meet the prerequisites set out in § 3-418 will be immunized by its final payment rule from any liability for negligence in dealing with the forged check.
 
 
 38
 The above scheme allocating forgery losses among the various parties to the check collection process operates without regard to fault. The drawee's duty to charge its customer's account only for "properly payable" items and the warranty of title given by prior parties in the chain of transfer impose standards of strict liability.
 
 
 39
 Fault does occupy a secondary role in the UCC treatment of forgery losses. One whose negligence substantially contributes to the making of an unauthorized signature cannot assert the invalidity of that signature against a holder in due course or a drawee who without negligence pays the check. § 3-406. Thus the drawee can pass the loss back to a drawer or forward to a prior party in the collection chain whose negligence substantially contributed to a forgery. The complaining party's negligence will not, however, bar otherwise available recovery against a party, including a drawee, who is also negligent. Id. Additionally, while nothing in the Code precludes a bank and its customer from modifying the forgery loss rules by contract, the bank cannot enforce an agreement permitting it to act in violation of reasonable commercial standards. § 4-103(1).
 
 
 40
 B. The Code Policy: Incompletely Greasing the Commercial Wheels
 
 
 41
 In sum, the Code, while allowing for some modification on the basis of fault or agreement, sets up a system of strict liability rules allocating loss according to the type of forgery. The system uneasily rests on two policy bases. First, it incorporates an at least partially outmoded notion of the relative positions of drawee banks and prior parties in the collection chain with respect to detecting different types of forgeries. Second, it incompletely serves the notion that commerce will be facilitated by bringing to the swiftest practicable conclusion the processing of a check transaction.
 
 
 42
 As mentioned, the separate treatment given forged checks and forged indorsements harkens back to the eighteenth century decision of the King's Bench in Price v. Neal. That decision left forged check liability on the drawee on the view that, as against other parties in the line of transfer, the drawee stood in the best position to recognize the signature of the drawer, its customer. The corollary principle for forged indorsements is that the person who takes the check from the forger frequently, as here, the depositary bank is in the best position to detect the bogus indorsement.
 
 
 43
 Reaffirming Price v. Neal in the final payment rule of § 3-418, the Code drafters recognized that the case's appraisal of relative opportunity to scrutinize drawer signatures was somewhat unrealistic in a nation where banks may handle some 60 million checks daily.[9] The contemporary pace of commerce has eroded the five senses used by bankers in the face-to-face era of Price versus Neal; little remains save the sensory activity of punching keys. While the drafters thus concluded that Price v. Neal had been drained of all its personality, they nevertheless insisted that its conclusion survives. The drafters noted that modern groundwork for the final payment rule could be found in the
 
 
 44
 less fictional rationalization . . . that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered.
 
 
 45
 § 3-418, Comment 1. In recognition of the frenetic commerce of our time, the thrust of the UCC here and elsewhere is for speed and facility at some expense to exact checks and balances.
 
 
 46
 Leaving forged check liability on the drawee may serve well this finality policy. That policy, however, does not itself justify separate treatment for forged checks and indorsements. The concern that commercial transactions be swiftly brought to rest applies with equal force to both varieties of wrongdoing. See White and Summers, supra, at 522-23; Comment, Allocation of Losses From Check Forgeries Under the Law of Negotiable Instruments and the Uniform Commercial Code, 62 Yale L.J. 417, 459-60 (1953).
 
 
 47
 While finality viewed alone calls for equal treatment of forged checks and forged indorsements, one might still maintain that forged indorsements merit separate rules. The modern demands of commerce have as the drafters recognized, deprived drawees of any superior opportunity to detect forged drawer's signatures. Only a concern for finality therefore justifies placing forged check losses on drawee banks.
 
 
 48
 Such simple expedients as requiring identification, however, may still permit transferees of checks to provide a significant protection against forged indorsements that drawees cannot. To insure such protective measures are taken, it may be sensible to override the finality policy and to place forged indorsement losses on the depositary bank or other party who takes from the forger. It should be immediately noted, however, that whatever force this approach has in the usual forged indorsement case is diminished where, as here, the suspect indorsement appears on a check that is itself forged. Someone forging a check will likely draw the check to a payee whose identity he can readily assume, such as himself or a fictitious person. In such circumstances the party who first takes the check may well have no particular opportunity to detect any impropriety in the indorsement.
 
 
 49
 In any case, we need not resolve whether the Code's rule of strict liability for those who take a forged indorsement check from the forger may be fully justified by the opportunity such parties have to thwart the criminal enterprise. It suffices to note that the Code bases its separate treatment of forged checks and forged indorsements on a finality policy that itself calls for no such distinction. Of course we have no mandate to ignore the codified distinction. The significance for this court today of the clash between the drafters' rule and the drafters' policy lies elsewhere.
 
 
 50
 Put simply, when we consider the arguments that these forged checks also contain unauthorized indorsements, we must keep in mind the Code's commitment to finality. We cannot call forged indorsements by any other name in order to serve our own interpretations of the balance between the UCC finality policy and relative opportunity to flush out forged indorsements. On the other hand, as we assess whether the highly unusual circumstances before us call for the label of forged check or forged indorsement, or how to operate if we are in the ill-defined and rarely encountered region in which both labels are applicable, we need not prostrate ourselves blindly before the formalisms of title on an assumption that depositary banks should be held accountable in every instance of improper indorsement. Without a uniform commercial blueprint for every possible fraud and forgery, our calling is to interstitial interpretation. In its pursuit we must recognize two considerations the UCC's concern for finality and the probability that depositary banks, whatever their position in the usual forged indorsement case, have no unique opportunity to detect improper indorsements on checks that are themselves forged.
 
 C. Placing Perini Within the Framework
 
 51
 We may now see how Perini's allegations and claims of error fit into the UCC scheme. Assume Quisenberry had included in his indorsements that he was signing "for" Quisenberry Contracting Co. or Southern Contracting Co. The case would become one involving only forged checks.[10] Accordingly, the drawee banks would be liable to the ostensible drawer, Perini, for improper payment. Perini would be precluded from asserting that liability, however, by its resolution authorizing payment of checks bearing the facsimile signature embossed by the machine or sufficiently similar signatures. Blocked from recourse against the drawees, Perini could reach back up the collection chain only against parties who had taken the checks in bad faith and therefore could not claim the protection of the § 3-418 codification of the Price v. Neal rule.[11]
 
 
 52
 The court below, after concluding in effect that the indorsements were valid, reached just this result. Under the orders on appeal, Perini is essentially left with a trial on the issue of Habersham's bad faith in handling Perini's checks. Habersham will be able to assert Perini's alleged negligence as a defense, and Perini may press allegations of Habersham's negligence in response.
 
 
 53
 Perini claims, however, that Quisenberry's failure to indorse in a representative capacity makes the case one of unauthorized indorsements and should entitle the company to recover from any of the three defendant banks on a strict liability basis. In other words, given the happenstance that Quisenberry failed to add to his indorsement "for Quisenberry Contracting Co.", Perini would impose strict liability for improper payment, breach of title warranty, and conversion in what would otherwise be a relatively straightforward forged check case.
 
 
 54
 Perini vociferously urges that a "parade of horribles" will follow if this court affirms the trial court's disposition of the dispute over the handling of these checks. It must be recognized and emphasized, however, that any such dire predictions relate necessarily to the highly questionable manner in which Quisenberry was able to obtain and deposit these checks. The alleged inadequacy of the indorsement bears no relation to those suspicious circumstances. Had the indorsements been letter perfect, Perini would have been limited in equally suspicious circumstances to asserting Habersham's bad faith.
 
 
 55
 The Code does generally provide an ostensible drawer greater protection in such circumstances. For its own commercial reasons, however, Perini chose to employ a facsimile signature machine and agreed to forfeit its otherwise absolute right to have its drawees recredit its accounts for any payments of forged checks. Perini's inability to recover from the drawees on the basis of the forged drawer's signature cannot fuel in the slightest its arguments regarding the indorsements. Those arguments must stand or fall on their own.
 
 
 56
 In short, this case does not present the possibility of lowering one whit the UCC protection offered bank customers against losses from forged checks; it presents only the effect on a forged check case of a malefactor's failure to make an indorsement proper in form.
 
 
 57
 We must now consider that effect, which arises in two possible ways. First is the claim that there exists liability on the basis of the indorsements themselves. This surfaces in the statutory claims for improper payment, breach of warranty, and conversion considered next in Part III. Second, Perini claims that the indorsements' adequacy affects the common law liability of Habersham and Fulton on the forged drawer signatures. Those defendants avoid such liability, which would attach regardless of due care or good faith, only by virtue of the final payment rule. We consider in Part IV the claims that an improper chain of indorsement renders unavailable the protection of that rule.
 
 III. Perini's Claims on the Indorsements
 
 58
 Perini maintains that defects in the indorsements directly give rise to liability under three distinct causes of action. First, the company argues that drawee Morgan Guaranty should be held strictly liable for paying items not "properly payable", in violation of its duties under § 4-401. Second, Perini claims that the defective indorsements resulted in a breach by Habersham and Fulton of the warranty of title imposed by §§ 3-417(1)(a) and 4-207(1)(a). Finally, the appellant would hold all three banks liable in conversion, § 3-419(1)(c), on the basis of the indorsements.
 
 
 59
 In the circumstances of this case, all three actions rise or fall on the same alleged improprieties in the indorsements and may be treated as one.[12] That one claim raises two possible bases of liability on the indorsements. First, Perini suggests the indorsements were invalid because they were forged, that is, made by someone who only pretended to be Jesse Quisenberry and to represent the payee businesses. Second, Perini argues that the indorsements were invalid because they were not made in a representative capacity. More specifically, Perini claims that the district court erred in disposing of both these questions by summary judgment.
 
 
 60
 A. What if Quisenberry wasn't Quisenberry?
 
 
 61
 In analyzing Perini's first contention, we may treat the indorsements as if they had been proper in form. In other words, we here assume that the checks had been drawn to "Jesse D. Quisenberry" and indorsed in that form or that they had been drawn as they were and indorsed in a representative capacity. The claim is that the suspicious circumstances surrounding the checks create sufficient uncertainty regarding the authenticity of any such indorsements that the trial court should have assumed they were forged in assessing defendants' motions for summary judgment.
 
 
 62
 The Code creates a presumption that signatures on an item are genuine. § 3-307(1)(b). The official comments to § 3-307 explain the operation of that presumption:
 
 
 63
 It means that until some evidence is introduced which would support a finding that the signature is forged or unauthorized the (party claiming under the signature) is not required to prove that it is authentic.
 
 
 64
 § 3-307, Comment 1.
 
 
 65
 Thus the burden of putting in issue the authenticity of Quisenberry's indorsements lay squarely with Perini. Given the presence of the forged drawer's signatures, the absolute failure of Habersham to verify Quisenberry's identity, and the many other unusual circumstances developed in the record, however, the court below should have assumed for summary judgment purposes that "Jesse D. Quisenberry" and the two payee contracting companies were nothing other than the products of dark imagination. Whether anything in the record obliged the court also to assume that Perini would prove that the wrongdoers had used the names of a real person and real businesses is less clear. Little in the record suggests that there ever existed a "Jesse Quisenberry", a "Quisenberry Contracting Co.", or a "Southern Contracting Co." Much suggests all were fictitious.
 
 
 66
 Whether the names were fictitious or not, however, any lack of authenticity does not alter the result reached by the district court. In either case the Code clearly indicates that lack of authenticity would not render the indorsements ineffective.
 
 
 67
 The authenticity question is answered by § 3-405(1), which provides as follows:
 
 
 68
 An indorsement by any person in the name of a named payee is effective if . . . (b) a person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument . . .
 
 
 69
 (emphasis added). Assuming the indorsements were inauthentic, it is clear that whoever drew them intended the named payees, fictitious or real, to have no interest in the checks.[13] Either situation falls squarely within § 3-405(1)(b).[14] Accordingly, § 3-405 eliminates any suggestion that the indorsements in the case at bar were ineffective because they were not genuine. Any ineffectiveness in these indorsements stems from the fact that Quisenberry failed to indorse in a representative capacity.
 
 
 70
 B. Failure to Indorse in a Representative Capacity
 
 
 71
 The checks in question name as payee either "Quisenberry Contracting Co." or "Southern Contracting Co." Each is indorsed simply "Jesse D. Quisenberry". Without requiring that the indorsements evidence authority to sign for the named payees, Habersham and Fulton forwarded these checks for payment, and Morgan Guaranty paid them.[15] Perini insists that by doing so each incurred liability.
 
 
 72
 We agree with the trial court that these indorsements were "arguably ineffective." The argument is that a signature, even by an authorized agent, does not bind the principal unless the signature incorporates in some manner the principal's name. See § 3-401, Comment 1; White and Summers, supra, at 401.[16] A check drawn to the principal requires his signature for negotiation. If, as here, the check does not bear the principal's indorsement, any transferee may be unable to satisfy the statutory warranty of good title, and payment of such a check may not accord with the order of the drawer.
 
 
 73
 Courts have visited liability on collecting and paying banks in cases of indorsements lacking evidence of representative capacity and in analogous cases involving the missing indorsements of a joint payee. It is equally clear, however, that parties in the collection chain are not held strictly accountable for every loss that might have been prevented by refusal to collect or honor checks bearing such defective indorsements. We now turn to the arguments of the appellee banks that the peculiar circumstances of the case at bar preclude shifting Perini's $1.1 million forged check loss on the basis of Quisenberry's failure to indorse in a representative capacity.
 
 
 74
 1. Sole Proprietor of Named Payee Businesses
 
 
 75
 The banks first claim that the indorsements were effective because Jesse Quisenberry was the sole proprietor of the named payees. Under Georgia law, a person operating a business under a trade name may indorse personally checks drawn to him under his trade name. See McCrackin v. Hayes, 118 Ga.App. 267, 163 S.E.2d 246 (1968).[17]
 
 
 76
 In the case at bar, however, the argument runs factually aground. As in McCracken, supra, the faces of the checks suggest that the payees are corporations. Little in the record tends to establish the contrary. Quisenberry's was the only signature on the sole proprietorship signature cards used in opening the accounts at Habersham. The cards mean little, however, as the district court recognized that it was doubtful whether anyone at Habersham had actually determined that the businesses were sole proprietorships or corporations.
 
 
 77
 Given this factual uncertainty and the apparent discrepancy between payee and indorser, the district court would have courted severe difficulties had it attempted to rest a grant of summary judgment for defendants on the assumption that the checks were drawn to Quisenberry under trade names. The judge below did not rely on this assumption, and we likewise decline the invitation.2. Bank Stamp Substitute for Indorsement
 
 
 78
 The district court did place importance on the fact that Habersham impressed on the back of ten of the checks the following stamp:
 
 
 79
 CREDIT TO THE ACCOUNT OF THE Within Named Payee in Accordance with Payee's Instructions Absence of Endorsement Guaranteed.
 
 
 80
 The court below determined this stamp sufficient to remove any question of the efficacy of Quisenberry's personal indorsement of these ten checks. We cannot agree.
 
 
 81
 The stamps draw whatever power they have from § 4-205(1):
 
 
 82
 A depositary bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title unless the item contains the words "payee's indorsement required" or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by the customer or credited to his account is effective as the customer's indorsement.
 
 
 83
 This Code section, another lubricating agent in the service of commerce, permits banks to speed the collection process "by eliminating any necessity to return to a non-bank depositor any items he may have failed to indorse." § 4-205, Comment 1. The First Circuit has noted that the provision is one of several in Article 4 that recognize the common contemporary practice of accepting unindorsed checks for deposit. See Bowling Green, Inc. v. State Street Bank and Trust Co., 425 F.2d 81 (1st Cir. 1970).
 
 
 84
 A § 4-205 stamp, however, cannot eliminate the depositary and collecting banks' warranty of title or the drawee's duty to accept only properly payable items. Assume a thief of a check convinces a depositary bank that he is the named payee. The bank deposits the check for the thief in an account opened in that name. Whether the thief forged an indorsement or left the reverse side of the check blank, the bank could not give itself good title to the stolen check by application of a § 4-205 stamp. No reported case we have found addressed such a proposition, much less supports it.
 
 
 85
 Rather, § 4-205 allows the bank to forward an indorsed check for collection subject to the same potential warranty liability it faces whenever it transfers a check with a facially regular indorsement. Whether a check bears such an indorsement or a § 4-205 stamp, the collecting banks remain liable for breach of title warranty and the drawee for improper payment if the purported payee proves to have been the thief from, or an unauthorized agent of, the true payee who never received the proceeds of the check.
 
 
 86
 It may be emphasized here, however, that we are not concerned with whether Quisenberry was in fact the authorized agent of the contracting companies. Like the authenticity of Quisenberry's signatures, this question is answered by § 3-405.[18] Given the fact that the drawer intended those companies, fictitious or real, to have no interest in the checks, anyone could have effectively indorsed them in the name of the payee companies regardless of authorization.
 
 
 87
 We are concerned rather with the fact that the indorser here omitted the names of the payee companies he appeared to represent. It might be argued that, with questions of authenticity and authorization removed, the stamp could suffice to remedy such an omission. Courts that have dealt with these and analogous omissions, however, have rested their determinations on an assessment of the relationship between the defect in the indorsement and the loss complained of. A § 4-205 stamp, designed to facilitate check collections but not to abrogate the warranty and proper payment obligations imposed by the Code, cannot immunize the appellee banks from scrutiny of the consequences of Quisenberry's defective indorsement.3. Scope of Liability for Accepting Incomplete Indorsements
 
 
 88
 Numerous cases under the Code and earlier law recognize that a party who transfers or pays a check bearing an incomplete indorsement incurs no liability if the proceeds of the check reach the intended payee. See First National Bank of Gwinnett v. Barrett, 141 Ga.App. 161, 233 S.E.2d 24 (1977); Blackmon v. Hale, 1 Cal.3d 548, 83 Cal.Rptr. 194, 463 P.2d 418 (1970); Gotham-Vladimir Advertising, Inc. v. First National City Bank, 27 A.D.2d 190, 277 N.Y.S.2d 719 (1967); Commercial Credit Corp. v. Empire Trust Co., 260 F.2d 132 (8th Cir. 1958); Gilbert v. Chase National Bank, 108 F.Supp. 229 (S.D.N.Y.1962); Florida National Bank at St. Petersburg v. Geer, 96 So.2d 409 (Fla.1957). Emerging from these cases is the notion that in accepting for deposit or in paying a check with an incomplete indorsement, a bank does not become accountable for every loss that would not have occurred had the bank returned the check for a proper indorsement. Rather, the bank becomes accountable for any manifestation of the danger evidenced by an incomplete indorsement; i. e., that some person with a superior claim to the rights created by the instrument will surface and demand payment.
 
 
 89
 That danger has not manifested itself in the case at bar. There is not the slightest hint in the record that entities named "Southern Contracting Co." and "Quisenberry Contracting Co." or their transferees are loitering in the lobbies with a claim to these checks. As far as this litigation is concerned, the proceeds of the checks went to the payees designated on the face of the instruments.
 
 
 90
 We need not, however, accept fully the proposition that one dealing with an incomplete indorsement risks only the possibility that he is dealing with someone other than the check's true owner. Rather we may limit our holding to the unusual instances in which a defective indorsement accompanies a forged drawer's signature. We do so with reference to the body of "double forgery" cases, in which the majority of courts have long assessed liability as if the drawer's signature alone were forged. In line with those cases, we conclude that as a matter of law Perini's loss is a forged check loss, not an indorsement loss. Accordingly, no liability can be assessed against the appellee banks on the basis of Quisenberry's indorsements.
 
 
 91
 a. No claim to payment asserted on behalf of the designated payee.
 
 
 92
 As the court below recognized, handling a check bearing an incomplete indorsement creates no liability so long as the proceeds reach the payee designated by the instrument. In Gotham-Vladimir Advertising, Inc. v. First National City Bank, 27 A.D.2d 190, 277 N.Y.S.2d 719 (1967), a participant in a joint venture had drawn checks to the new entity, Clark-Gotham. The checks were indorsed "Clark Associates", the old name of the other participant, and deposited in an account bearing that name. When debts and unauthorized withdrawals depleted the funds of the joint operation, the drawer brought suit against the drawee, alleging payment over an improper indorsement. The court rejected the claim, finding that the check proceeds had gone to the intended recipients and that the drawer's loss could not be related to any improprieties in the indorsements.
 
 
 93
 The Court of Appeals of Georgia has recently addressed a similar problem and reached the same conclusion. In First National Bank of Gwinnett v. Barrett, 141 Ga.App. 161, 233 S.E.2d 24 (1977), the payee had failed to indorse a check. The depositary bank had failed to supply the missing indorsement by a § 4-205 stamp. The drawers sued the drawee for improper payment. The court reversed a summary judgment for plaintiffs, noting that the depositary bank had paid the check to the named payee. Though the court did not expressly order judgment for the drawee, the conclusion that payment in the circumstances was proper leaves no room for liability for failing to return the check.
 
 
 94
 Other cases follow this approach.[19] We shall draw on only one for some explication of the undergirding rationale. Decided under the Negotiable Instruments Law, Gilbert v. Chase National Bank, 108 F.Supp. 229 (S.D.N.Y.1962), involved an indorsement very similar to those at issue here. A check drawn to "Snowden Oil & Gas Co., Ltd." was indorsed only in the names of Clark and Hemby, a limited partner and another party with an interest in the payee. The depositary bank had credited the proceeds to the Snowden account. Then-District Judge Kaufman refused to allow the drawer's claim of improper payment against the drawee.
 
 
 95
 The court stated baldly that there is no sacred relationship between an indorsement and the legal payment of a check. More specific meaning may be gleaned from the court's quotation from Osborn v. Gheen, 16 D.C. 189, 194 (Sup.Ct.D.C. 1886), aff'd, 136 U.S. 646, 10 S.Ct. 1072, 34 L.Ed. 552 (1889):
 
 
 96
 But (an indorsement) is not necessary . . . to give validity to a payment. The bank makes the payment, of course, at its peril, if the payee shall afterwards challenge the payment and say that the money was not paid to him, but to somebody else.
 
 
 97
 Gilbert, supra, 108 F.Supp. at 231. The drawee bank in Gilbert had complied with the drawer's order. Although the bank might have returned the check for a proper indorsement, its failure to do so did not render it liable for the drawer's loss on the transaction underlying the check.
 
 
 98
 The Code definition of negotiation and the warranties it imposes may imply a more strict relationship between indorsement and title than that recognized in Gilbert. Interpretation of the Code, however, need not be wholly formalistic. Where missing or formally incomplete indorsements are concerned, it is consistent both with the drafters' emphasis on speeding the collection process and with ample customer protection to limit the liability of paying and collecting parties to the situation in which the intended payee did not receive the proceeds of the check.[20]
 
 
 99
 Cases decided under the Code, such as Gotham-Vladimir and Barrett, suggest that such a delimitation of liability is appropriate. It is true, as Perini points out, that in all the cases discussed the drawer did intend to make some payment to the party who eventually received payment. Forcing a bank to reimburse the drawer because of the incomplete indorsement would have resulted in a windfall to the drawer. As the court below noted, however, the cases rest equally on the observation that the losses claimed by the drawers were not related to the improper indorsements. Implicit in that observation is a limitation of liability to claims raised in the name of the true payee.[21]
 
 
 100
 That limitation bars Perini's indorsement claims. Upon this record, there is no possibility that a true payee will demand payment and subject the appellant company to dual liability.[22] Perini argues that if someone in the collection process had returned the check for proper indorsement, something might have happened in the interim to prevent the loss it did suffer. The argument is of no avail. It could have applied to drawers in all the missing or incomplete indorsement cases discussed above.
 
 
 101
 Perini has not encountered the peril created by missing or incomplete indorsements. The Code does not compel, and its policies do not counsel, that this court shift the loss Perini did incur to the appellee banks on the basis of Quisenberry's failure to add to his indorsement words of agency.
 
 
 102
 b. The presence of forged drawer signatures.
 
 
 103
 Nevertheless, we need not announce that, as a matter of law, liability for handling missing or incomplete indorsements shall extend no further than necessary to provide for claims of the true payee. Rather, we hold only that such a limitation of liability is appropriate when the missing or incomplete indorsement is on a forged check. The ostensible drawer's loss in such a situation can generally, as here, be related to the defective indorsement in only the most speculative fashion. No sound basis exists for extending liability for handling the indorsement beyond the unlikely event of a claim of superior right to payment under the instrument.[23]
 
 
 104
 Our holding receives support from the "double forgery" cases in which courts have grappled with claims that forged checks also bear forged or improper indorsements on which liability might be predicated. Prior to the Code, the majority of jurisdictions treated double forgery cases as if they involved forged drawer's signatures alone. See Comment, supra, 62 Yale L.J. at 455. Thus the loss rested with the drawee, who had to recredit the account of the ostensible drawer but could not recover from prior collecting banks under the rule of Price v. Neal.[24]
 
 
 105
 Discussing the application of Price v. Neal in the double forgery context, the Supreme Court in United States v. Chase National Bank, 252 U.S. 485, 496, 40 S.Ct. 361, 363, 64 L.Ed. 675 (1920), suggested the theory limiting indorsement liability that we recognize today:
 
 
 106
 The forged indorsement puts (the drawee) in no worse position than he would occupy if that were genuine. He cannot be called upon to pay again and the collecting bank has not received the proceeds of an instrument to which another held a better title.
 
 
 107
 The Court treated the dispute as a forged check case, and, applying Price v. Neal, left the loss on the drawee.
 
 
 108
 Commentators have suggested with remorse that the Code warranties of title overturned this analysis and required treating double forgery cases under the rules of forged indorsement liability. See Comment, supra, 62 Yale L.J. at 455.[25] At least one recent case, however, suggests that the title warranty does not mandate shifting the loss to collecting banks in a double forgery case.
 
 
 109
 In Aetna Life and Casualty Co. v. Hampton State Bank, 497 S.W.2d 80 (Tex.Civ.App.1973, writ ref'd n. r. e.), the court had to determine whether a forged indorsement rendered a depositary bank liable in circumstances similar to the case at bar. Someone had stolen company checks and forged the drawer's signature. He made the checks payable to a fictitious "Pizza Inn # 32" and indorsed them in that manner. The depositary bank credited an account he had opened in the name of "Pizza Inn # 32."
 
 
 110
 The court rejected the argument that the forged indorsement deprived the depositary bank of title and gave rise to warranty liability:
 
 
 111
 A warranty of title is nothing more than an assurance that no one has better title to the check than the warrantor, and therefore, that no one is in a position to claim title as against the warrantee, as the payee or other owner of a genuine check could do if his endorsement were forged.
 
 
 112
 On payment of the check to Hampton, Northwest's loss could not be said to have resulted from any breach of Hampton's warranty of title because no person whose name appeared to be endorsed on the check has asserted any claim of title based on lack of a genuine endorsement. Northwest's loss was rather the result of paying out its money on a check to which its own depositor's name was forged.
 
 
 113
 497 S.W.2d at 84 (citations omitted). The loss in the instant case is equally the result of the drawees' paying checks to which Perini's name was forged, rather than any claim of title raised by "Southern Contracting Co." or "Quisenberry Contracting Co." That Perini's facsimile signature resolution precludes it from placing the forged check loss on the drawees does not make it any the less a forged check loss.
 
 
 114
 It is true that the indorsements in Aetna were in the name of the named payee. The case thus fell squarely under § 3-405(1)(b), the "fictitious payee" provision we earlier encountered.[26] Quisenberry's failure to indorse in the name of the contracting companies does remove the case from the coverage of that provision.
 
 
 115
 Nonetheless we find that the Aetna court's definition of title warranty and characterization of a double forgery loss extends persuasively to the case at bar. Others have explained why no warranty liability should arise even in the "true" double forgery situation not covered by § 3-405(1)(b):
 
 
 116
 Since the drawer whose signature is forged is not meeting an obligation to the payee and the payee is not entitled to payment in the first place, the drawee bank could not be compelled to pay again. Thus, the drawee bank's loss (here Perini's loss as the estopped drawer) results not from making payment to the wrong person because of a forged indorsement, but from making any payment at all on the basis of a forged drawer's signature.
 
 
 117
 O'Malley, The Code and Double Forgeries, 19 Syracuse L.Rev. 36, 43-44 (1967).[27] The appellee banks did pass along and pay checks with a discrepancy between payee and indorsement. They credited the proceeds, however, to accounts in the names of the designated payees. In such a situation courts dealing with valid checks generally limit indorsement-related liability to the claims of the true payee. We find such a limitation particularly appropriate where the defective indorsement occurs on a forged check, in which case no true payee can demand payment. Accordingly, we hold that the indorser's failure to sign a forged check in a representative capacity provides no basis for imposition of improper payment, warranty, or conversion liability.[28] On this basis we affirm the judgment in favor of appellees on these claims, as well as the claims of common law conversion and breach of an implied deposit contract.[29]
 
 IV. Perini's Forged Check Claims
 
 118
 We have explained our understanding why this case should receive the treatment that the Code, echoing Lord Mansfield, would give a forged check case. Perini maintains that the district court's treatment of its suits against Habersham and Fulton was erroneous even under that assumption.[30] Its arguments are two-fold: first, the company claims that the final payment rule is inapplicable to suits brought by a drawer; second, Perini urges that the incomplete indorsements preclude Habersham and Fulton from clothing themselves in the final payment rule. After a brief description of the nature of Perini's forged check claims against Habersham and Fulton, we shall explain why we find unavailing the company's dual arguments.
 
 
 119
 Nothing in the Code provides Perini an action against the collecting banks on the basis of the forged drawer's signature. The UCC, however, displaces common law causes of action only to the extent they are inconsistent with the provisions of the Code. See § 1-103. Perini brought negligence and restitutionary causes of action against Habersham and Fulton in connection with the banks' handling of the forged checks. Those actions would allow Perini to recover without demonstrating, as it must under the district court's disposition, that Habersham acted in bad faith or had notice of defenses to the checks. The actions, however, are barred if the banks are entitled to the protections of the final payment rule. See § 3-418, Comment 4; White and Summers, supra, at 521-22. We conclude that rule does apply to Perini's claims as ostensible drawer, regardless of the incomplete indorsements.
 
 
 120
 A. § 3-418 Applies to Suits by a "Drawer"
 
 
 121
 Perini maintains that the final payment rule protects holders in due course and persons who have relied on the payment in good faith only against the subsequent claims of a drawee or other payor. Perini's argument lacks authority and is completely contrary to the finality policy incorporated in the rule.
 
 
 122
 The only cases cited by appellant in which a drawer has been permitted to sue directly a depositary or collecting bank involved forged or incomplete indorsements, not forged checks. See Prudential Insurance Company of America v. Marine National Exchange Bank, 315 F.Supp. 520 (E.D.Wis.1970); Insurance Co. of North America v. Atlas Supply Co., 121 Ga.App. 1, 172 S.E.2d 632 (1970). The final payment rule expressly provides that it is subject to warranty claims occasioned by such indorsements. These cases provide no basis for permitting a drawer's forged check suit against a depositary or collecting bank.
 
 
 123
 No authoritative basis could be supplied for such a suit, for it would completely undermine the finality policy incorporated in § 3-418. That provision allows one who meets its prerequisites to transfer a check secure in the knowledge that payment by the drawee ends the transaction with respect to claims that the drawer's signature is forged. See § 3-418, Comment 1. To allow the drawer, who as a regular customer of the drawee might be tempted to shift the loss away from that bank, the option of reopening the transaction would frustrate the expectations created by the Code. If Habersham and Fulton meet the final payment rule's prerequisites, they are entitled to assert its protection against Perini.
 
 
 124
 B. "Holders" of Forged Checks Bearing Incomplete Indorsements
 
 
 125
 The rights of Habersham and Fulton to the sanctuary of Price v. Neal rest on whether those banks may claim holder in due course status. Specifically, we need address only the question whether the incomplete indorsements prevented the banks from becoming holders. Habersham's good faith and lack of notice of defenses to the check, the other relevant requisites to holder in due course status, remain properly set for further proceedings under the orders of the court below. We agree with that court that Perini has failed to raise any issue as to Fulton's good faith and lack of notice.[31]
 
 
 126
 The Code defines "holder" as a person who is in possession of an instrument "drawn, issued, or indorsed to him or to his order or to bearer or in blank." § 1-201(20). Perini's contention is that Quisenberry's failure to indorse in a representative capacity precluded Habersham from claiming the checks were indorsed to it. In this concatenation of circumstances that appears to have outstripped the imaginations of those who would call themselves learned in the ways of negotiable instruments, we conclude that "holder" need not be construed so narrowly. If a depositary or collecting bank in this situation can satisfy the other requirements of § 3-418, allowing it over the "holder" hurdle is consistent with the Code's separate treatment of forged check and indorsement losses, the ample customer protections provided by that bifurcated scheme, and the drafters' recognition of the fact that banks today frequently do not return checks missing or bearing incomplete indorsements.
 
 
 127
 First, we note that application of the § 4-205 stamp guaranteeing the absence of indorsements sufficed to make Habersham and Fulton "holders" of the checks bearing those stamps. The court in Bowling Green, Inc. v. State Street Bank & Trust Co., 425 F.2d 81 (1st Cir. 1970), recognized that missing indorsements may be supplied by such stamps. See also White and Summers, supra, at 459. The stamps should equally operate to remedy the omission of representative capacity.[32]
 
 
 128
 We also find that, in the highly unusual circumstances presented, the banks may be properly treated as holders of those checks that Habersham failed to stamp. As in Bowling Green, supra, where the depositary bank was accorded holder status despite the complete absence of either indorsement or § 4-205 stamp, we have some doubt "whether the bank's status should turn on proof of whether a clerk employed the appropriate stamp." 425 F.2d at 84.
 
 
 129
 The instant case involves checks that anyone could effectively indorse. This is so because the named payees were either fictitious or not intended to receive payment. See § 3-405(1)(b). Thus while in some sense Quisenberry was not necessarily in possession of checks drawn "to him", he or anyone else in possession of the checks did have the capacity to negotiate them. In effect these are checks on which anyone could occupy the position of payee. Where there has been absolutely no indication that the payee contracting companies existed and that Quisenberry was not their authorized agent, his failure to indorse in a representative capacity does not require us to find that Habersham dealt with someone other than the payee.
 
 
 130
 Under § 3-302(2), a payee may be treated as a holder, despite his taking the instrument directly from the obligor. The shelter provision of § 3-201 conveys to the transferee of an instrument all rights held in the instrument by the transferor, regardless of any lack of indorsement. Given checks which anyone could effectively indorse, the insistence of Habersham on some indorsement, though incomplete, and the fact that Habersham credited accounts of the named payees, the dubious status of "holder" of forged checks may be bestowed upon Habersham and Fulton through "payee" Quisenberry.
 
 
 131
 True it is that holder in due course status is not to be lightly implied. Moreover, the drafters of the "fictitious payee" provision, § 3-405(1)(b), did suggest in making anyone's indorsement effective that takers of such checks require "what purports to be a regular chain of indorsements." § 3-405, Comment 1. Perhaps a different result would obtain had Quisenberry supplied no indorsement or had Habersham failed to credit accounts held in the names of the contracting companies. By crediting a check with an incomplete indorsement to the account of the named payee, however, a depositary bank generally restricts its liability to claims of the true payee. The hole opened by § 3-405(1)(b) to achieving holder status on forged checks is not so narrow that it will shift a forged check loss to a depositary bank which credits the named payee's account and meets the other requirements of holding in due course. Accordingly, Habersham was a holder of these forged checks and by its indorsements transferred that status to Fulton.
 
 
 132
 Concluding that Habersham and Fulton were holders will not enable banks to treat indorsements any less carefully. A depositary bank of course cannot disregard indorsements on the assumption that checks will prove forged. If we may take any position with confidence in this bog of conundrums it is that such riddles do not occur daily.
 
 
 133
 Our conferral of holder status rather serves the finality policy which the drafters' recognized as the only valid modern basis for the rule of Price v. Neal. It does so by refusing to turn an impropriety which itself provides no predicate for unauthorized indorsement liability into a device for shifting forged check liability back to collecting parties who may be holders in due course in every respect save that improper indorsement. The Code has given us the bifurcated remedy scheme of Price v. Neal. Treating Habersham and Fulton as holders is the conclusion most consistent with that scheme and its modern policy basis. Accordingly, we affirm the summary judgment in favor of Fulton on the restitutionary and common law negligence claims. We affirm also the conclusion of the district courts that Habersham's position as a holder in due course is to rest on the questions of good faith and notice.[33]
 
 V. Fulton's Credit Investigation
 
 134
 Before returning to hand-to-hand combat in the trial court over Habersham's good faith, Perini has one remaining weapon with which it would drag Fulton also into further fray. Perini's final volley misses easily.
 
 
 135
 The appellant claims that Fulton's credit department was negligent in failing to follow up on the discovery that "Jesse Quisenberry d/b/a Quisenberry Contracting Co." could not be located in Atlanta and that no business was located at the address Quisenberry gave Habersham. Perini maintains that the credit department should have known a "new loan customer" at Habersham would be writing checks and that those checks would pass through Fulton, Habersham's Atlanta correspondent bank. Consequently, Perini would hold Fulton accountable for failing to notify its own transit department to be on the lookout for "Quisenberry Contracting Co." checks.
 
 
 136
 While § 3-418 immunizes a holder in due course from liability for negligence in transferring a forged check, common law negligence might still follow if a forged check loss could be tied to a holder's unreasonable conduct outside of the collection process. We have held that Georgia banks are accountable for the proximate results of negligent conduct. See Midland Valley Plaza v. Georgia Railroad Bank & Trust Company, 542 F.2d 945 (5th Cir. 1976).
 
 
 137
 We are inclined to join the district court's conclusion that this is the rare case in which the plaintiff fails to put negligence sufficiently in issue to withstand a summary judgment motion. Fulton fully disclosed its discoveries regarding Quisenberry Contracting Co. to Habersham. The swift processing obligations imposed by the Code upon intermediary collecting banks are hard to reconcile with the investigative duties Perini would impose. In two years of discovery Perini has been unable to produce any evidence that any bank would have acted differently or an expert opinion that a bank should act differently.[34]
 
 
 138
 A simpler alternative solution presents itself. The Federal Reserve Bank in Atlanta processed the last of the Quisenberry Contracting Co. checks September 17, 1971. The check had already cleared Fulton. Fulton received the credit inquiry that same day, a Friday, and completed the investigation the following Monday. Thus the "suspicious" information regarding Quisenberry Contracting Co. was not in any of Fulton's hands until after the checks drawn to that name had passed through the transit department. All the checks that passed through thereafter were "Southern Contracting Co." checks, about which Fulton received no inquiry. Accordingly, any relay of information between credit and transit department would not have availed Perini.
 
 CONCLUSION
 
 139
 Perini suffered what is unmistakably a forged check loss. For its own commercial reasons it had largely assumed the risk of such loss. We have found no reason to seize upon the caprice of a malefactor's failure to indorse with words of agency and convert the forged check loss into an unauthorized indorsement loss, in derogation of the finality policy incorporated in the modern incarnation of Price v. Neal. Therefore we relegate Perini to trying the issue it has raised regarding Habersham's good faith and notice of defenses to the checks.
 
 
 140
 Much of Perini's arguments are in the nature of pleas not to overlook the relative fault of parties to these transactions. While the Code accords fault a limited role in remedying forgery problems, the contest to which Perini and Habersham are now remanded appears precisely designed to ferret out and redress any serious wrongdoing by a party to this litigation. Perini can ask no more. With the possible exception of Habersham, whose good faith remains to be tried, it would be a sham to fasten liability on the defendant banks, which operate in a world of electronic impulses and encoded integers, on the basis of the eyeball to eyeball mercantile confrontations of halcyon days. Minute examination of checks for forgeries is an old banker's tale; two hundred years after Price v. Neal, bankers do not purport to be graphologists.
 
 
 141
 The long course chartered by Perini has come full circle. Our musings en route have been an attempt to explicate, not obfuscate the orders of the able district court which we readily
 
 
 142
 AFFIRM.
 
 
 
 [1]
 The P.E.G. stamp employed by banks stands for "Prior endorsements guaranteed." While the Uniform Commercial Code, as will be seen, frequently fails to provide clear answers to questions in the area of negotiable instruments, it is unequivocal in its insistence that indorsement is to be spelled with the letter "i". Bankers, who claim to know much of such weighty matters, may insist on beginning with "e", but this practice could be attributed to the bankers' understandable reluctance to stamp "Pay any Bank PIG" on the backs of the checks they handle
 
 
 [2]
 Perini and Brown Brothers entered an agreement whereby Perini would take nothing from Brown Brothers. In return Brown Brothers permitted Perini to add the bank as a party plaintiff and assert Brown Brothers' rights against the collecting banks. Morgan Guaranty declined Perini's offer to enter a similar agreement
 
 
 [3]
 The Uniform Commercial Code is hereinafter referred to as the "UCC" or "Code." Georgia's version of the Code is found at Ga.Code Ann. §§ 109A-1-101 et seq. (1973). Further citations to the Code will omit the introductory reference to 109A
 
 
 [4]
 The exception to this observation is Perini's claim that its loss resulted from negligence on the part of Fulton's credit department in handling Claude Surface's inquiry regarding Quisenberry. This claim does not rest on the effectiveness of the indorsements and will be treated separately in Part V, infra
 
 
 [5]
 The questions arise under UCC Article 3, governing negotiable instruments generally, and Article 4, treating bank deposits and collections
 
 
 [6]
 Section 1-201(43) provides:
 "Unauthorized" signature or indorsement means one made without actual, implied or apparent authority and includes a forgery.
 
 
 [7]
 A check drawn to the order of the payee, i. e., an order instrument, may not be negotiated without the payee's indorsement. See § 3-202(1). The unauthorized indorsement by the forger does not operate as the true payee's signature. See § 3-404(1), which provides that "any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." A forged indorsement check therefore lacks the payee's indorsement and, without that necessary indorsement, may not be negotiated. See § 3-202(1). Negotiation is necessary to confer holder status on a check's transferee. Id. Accordingly, the transferee of a forged indorsement check does not become a holder. Only a holder or the holder's agent may properly present the check for payment. See § 3-504(1). Thus the UCC reaffirms the general pre-Code rule that a drawee may not charge its drawer customer's accounts for payment of an order instrument bearing a forged indorsement. See White and Summers, supra, at 559
 It may be assumed for purposes of this introductory sketch that the analysis described for forged indorsement checks equally applies to checks drawn to a principal and indorsed by an ostensible agent with no showing of representative capacity. Considerations unique to the representative capacity problem are developed more fully in Part III infra.
 
 
 [8]
 The § 4-207 warranties, which are given only by bank customers and collecting banks and which pertain directly to the check collection process, are in all relevant respects identical to the § 3-417 warranties, which are given by any person
 
 
 [9]
 For a discussion of the volume of checks processed and the resultant interplay between the law of forgery losses and bankers' perceptions of the forgery problem, see Murray, Price v. Neal in the Electronic Age: An Empirical Survey, 87 Banking L.J. 686 (1970). We note the commentator's interesting observation that many banks do not record separately losses from forged checks and forged indorsements, contrary to the implicit assumption in the final payment rule that the two types of losses represent security breakdowns in different functions of a bank accepting checks for deposit to its customers accounts and paying checks drawn by its customers which might call for different protective measures
 On the other hand, the author does suggest specific measures for protecting banks against forged check losses. The possibility remains that the separate allocation of strict liability for forged check and forged indorsement losses may act as some incentive for the development of those precautionary measures that consistent with the press of business will most effectively reduce the risk of loss from either type of forgery.
 
 
 [10]
 As will be developed in Part III infra, the case would be treated as involving only forged checks whether or not the person indorsing as Quisenberry was in fact named Quisenberry and whether or not there existed businesses under the names of Quisenberry Contracting Co. and Southern Contracting Co. that had authorized Quisenberry to indorse checks drawn to them
 
 
 [11]
 Perini's novel suggestion that § 3-418 precludes drawees, but not drawers, from reopening check transactions after payment by the drawee will be considered in Part IV infra
 
 
 [12]
 We note that there exist substantial questions whether the drawer of a check is a proper plaintiff in a conversion action and whether anyone other than the drawee bank that pays the check is a proper defendant to such an action. In Stone & Webster Engineering Corp. v. First National Bank & Trust Co., 345 Mass. 1, 184 N.E.2d 358 (1962), the court held that a drawer's remedy on a forged indorsement was limited to an action against the drawee bank for improper payment. On the other hand, we have recently affirmed a plaintiff's judgment in a conversion action brought by the remitter of a cashier's check against the collecting bank. See Tubin v. Rabin, 533 F.2d 255 (5th Cir. 1976). This case was governed by Texas law, but involved the UCC conversion provision, § 3-419(1)(c), adopted by Texas and Georgia without modification
 We do not find a direct answer to those questions in the Georgia cases. The questions need not detain us, however, in the case at bar. In forged indorsement cases, Georgia does permit a drawer to sue directly intermediary and depositary banks for breach of the statutory warranty of title. See Insurance Co. of North America v. Atlas Supply Co., 121 Ga.App. 1, 172 S.E.2d 632 (1970). Perini's claims that Habersham and Fulton became liable by taking and transferring checks with Quisenberry's personal indorsement are not different whether labelled warranty or conversion claims. Georgia law permits Perini to raise those claims under the warranty label, which suffices to take this court to the merits. See White and Summers, supra, at 504-05, n.25.
 
 
 [13]
 The only remaining possibility is that one "bad guy" forged the drawer's signature and made the checks payable to the named businesses actually intending to pay those businesses, and that a second "bad guy" stole the checks and forged the indorsements. Nothing in the record makes the slightest suggestion that such a sequence of events transpired. Accordingly, the legal consequences of such a situation need not concern us. We note, however, that such a situation would present the true "double forgery" problem. See O'Malley, Common Check Frauds and the Uniform Commercial Code, 23 Rutgers L.Rev. 189, 247 n.368 (1969). Our understanding of the proper disposition of double forgery cases is set out at Part iii.B.3.b. infra in connection with Perini's claim that Quisenberry's failure to indorse in a representative capacity renders this a case of unauthorized drawer's signatures and unauthorized indorsements
 
 
 [14]
 The official illustrations of § 3-405(1)(b) directly cover the two situations possibly presented by the case at bar:
 a. The drawer of a check (here, whoever applied the forged drawer's signature) . . . makes it payable to P, knowing P does not exist. . . .
 c. The drawer makes the check payable to P, an existing person whom he knows, intending to receive the money himself and that P shall have no interest in the check.
 § 3-405, Comment 3.
 Section 3-405(1)(b) deals with the standard "fictitious payee" case, in which a disloyal agent draws a check on behalf of the principal to the order of a fictitious payee or to someone whom the agent intends to have no interest. On the assumption that the principal is in the best position to protect against such a situation, the law does not allow him to recover from the paying bank on the basis of the indorsement.
 That situation is the same whether the agent employs a fictitious payee or a real payee he intends to have nothing to do with the check. In order to eliminate a problem arising under the predecessor provision, § 9(3) of the Uniform Negotiable Instruments Law, UCC § 3-405 makes clear that the test is "not whether the named payee is 'fictitious', but whether the signer intends that he shall have no interest in the instrument." § 3-405, Comment 3.
 Nothing in § 3-405(1)(b) limits its application to cases in which the drawer's signature is authorized. The provision has also been applied in forged check cases. See Aetna Life and Casualty Co. v. Hampton State Bank, 497 S.W.2d 80 (Tex.Civ.App.1973). The rationale underlying such an application will be more thoroughly developed at Part III.B.3.b. infra in considering the argument that the absence of representative capacity on the indorsements makes the case at bar one of both unauthorized drawer signatures and unauthorized indorsements.
 
 
 [15]
 Brown Brothers also paid some of the checks. By virtue of agreement with Perini, however, the bank is now aligned as a plaintiff-appellant. See note 2 supra
 
 
 [16]
 Because the Code allows a signature to be made "by use of any name, including any trade or assumed name", or "by any word of mark", § 3-401, one might suggest that a principal could adopt an agent's personal signature as his own. Recognition of such an unlikely arrangement, however, would require proof of such an undertaking by the principal, proof that cannot be said to exist in this record in a manner justifying summary judgment against Perini. Nor could that proof be supplied by the Code's presumption that signatures are genuine. Extension of the presumption to this "agent as principal's signature" theory would run counter to the drafters' recognition of the traditional rule that "a principal whose name does not appear on an instrument signed by his agent is not liable . . . ." § 3-401, Comment 1
 
 
 [17]
 Under § 3-203, a person may indorse in his own name a check drawn to him under some other name, as by mistake. Though the section permits indorsement in the true name alone, the official comments make clear that indorsement showing both names is preferred. § 3-203, Comment 1
 
 
 [18]
 See Part III. A, supra
 
 
 [19]
 See Commercial Code Credit Corp. v. Empire Trust Co., 260 F.2d 132 (8th Cir. 1958) (drawee paid check missing indorsement of one co-payee; drawer cannot recover from drawee where proceeds went to intended payee; drawer's loss was from souring of underlying transaction, not indorsement); Florida National Bank of St. Petersburg v. Geer, 96 So.2d 409 (Fla.1957) (pre-Code; recognizes rule that a drawee is not liable for paying a check on an improper indorsement if the intended person received the proceeds); cf. Blackmon v. Hale, 1 Cal.3d 548, 83 Cal.Rptr. 194, 463 P.2d 418 (1970) (cashier's check paid to trust account intended by remitter; cashier's check had not used full name of that account; indorsement was in full name; remitter denied relief from depositary bank)
 
 
 [20]
 The analysis applies equally where the incomplete indorsement is not that of the payee, but of a subsequent transferee
 
 
 [21]
 The limitation restricts claims categorically to those raised on behalf of the true payee. It does not import a jury question of the proximity of the link between improper indorsement and loss
 
 
 [22]
 Although it is clear this case presents no prospect of a true payee raising a superior claim to payment of these checks, Perini attempts somehow to raise such a claim in its own name, asserting conclusorily that the checks belonged to it
 Perini, however, has no claim to payment on the checks. The drawer of a valid order instrument cannot demand payment from the drawee. See Stone & Webster Engineering Corp. v. First National Bank & Trust Co., 345 Mass. 1, 184 N.E.2d 358 (1962). Similarly, one whose pre-printed checks are stolen owns the pieces of paper, but the order of payment created by the thief who forges the drawer's signature does not run to the victim. The Code's ample protections against forged check losses are discussed in Part II. A, supra.
 
 
 [23]
 This unlikely event would occur only if the forging drawer intended payment to the named payee, the check was subsequently stolen, and the indorsement forged. Even there, however, the named payee would have no right to demand payment from the account of the ostensible drawer whose signature was forged. See O'Malley, supra, 23 Rutgers L.Rev. at 247, n. 368
 
 
 [24]
 Perini's corporate resolution regarding the facsimile signatures prevents it from demanding that the drawees recredit its account. We cannot see how this fact could alter any duties of the prior collecting banks from which liability might arise. Those banks had no indication of the drawer-drawee agreement and therefore no reason to treat these checks differently than all others
 
 
 [25]
 The authors of this comment, like the great majority of these who have addressed the subject of double forgery, regarded any shift away from the pre-Code analysis as an unwarranted and undesirable departure from the finality principle of Price v. Neal. See Comment, supra, 62 Yale L.J. at 460; O'Malley, supra, 23 Rutgers L.Rev. at 245-47; Palazzi, Forgeries and Double Forgeries Under Articles 3 and 4 of the UCC, 42 So.Cal.L.Rev. 659, 678 (1962); O'Malley, The Code and Double Forgeries, 19 Syracuse L.Rev. 36, 42-44 (1967)
 
 
 [26]
 See Part III. A, supra
 
 
 [27]
 The "true" double forgery would occur when a forger drew a check intending payment to the named payee, the check was subsequently stolen, and the thief forged the indorsement
 
 
 [28]
 On remand, Perini will be free to raise Habersham's handling of the indorsements in questioning whether it can meet the good faith and absence of notice requirements necessary for the depositary bank to invoke the protections of the final payment rule against claims on the forged drawer's signatures. See Palazzi, supra, at 678 n. 73
 
 
 [29]
 Three cases cited by Perini on the double forgery question merit brief comment. In Travco Corp. v. Citizens Federal Savings & Loan Association of Port Huron, 42 Mich.App. 291, 201 N.W.2d 675 (1972), the court shifted a double forgery loss back to the savings and loan association that cashed the checks. The indorsements were in a personal capacity only, though the checks were drawn to fictitious companies. The court found § 3-405(1)(b) inapplicable because the indorsements were not in the names of the named payees. We note that in Travco the savings and loan association did not accept a deposit and credit the named payee's account as did Habersham. Rather, it paid out cash immediately to the purported agent. In any case, we are unpersuaded by the terse opinion in Travco that Perini's loss should be treated as an unauthorized indorsement loss
 Second, Georgia did follow the minority pre-Code rule in double forgery cases and allow recovery against the collecting banks. See Cairo Banking Co. v. West, 187 Ga. 666, 2 S.E.2d 91 (1939). However, the courts based their approach on the negligence of the collecting parties. When Georgia adopted the Code's final payment rule, which renders negligence of the prior collecting parties irrelevant in a forged check case, the proper approach to double forgery cases became an open question in that state.
 That question was not answered in Bank of Thomas County v. Dekle, 119 Ga.App. 753, 168 So.2d 834 (1969). The issue there was the timeliness of a drawer's improper payment suit on checks containing both forged drawer's signatures and forged indorsements. The court allowed the suit to proceed on the basis of the longer period allowed the drawer for discovery of forged indorsements. See § 4-406. The court did not reach the merits of the suit. Section 3-405(1)(b) would appear to have made the indorsements effective. The checks of course were still not properly payable because forged. The court may have seized on the indorsements for purposes of the timeliness question alone, allowing the drawer to proceed with a valid improper payment suit that would ultimately rest on the forged drawer's signatures. In any case Dekle only involves the relationship between drawer and drawee and did not confront the expectations of prior collecting parties created by the final payment rule. Moreover, the drawer-drawee relationship in the case at bar is governed by the law of New York. See § 4-102(2).
 
 
 [30]
 Perini's forged check claim against Morgan is barred by its corporate resolution authorizing payment of checks bearing the machine-embossed signature or reasonable facsimile
 
 
 [31]
 Perini's negligence based on Fulton's credit investigation of Quisenberry Contracting Co. is discussed at Part V, infra
 
 
 [32]
 This conclusion is not inconsistent with the observation earlier that the stamps cannot eliminate warranty of title liability. All holders in due course are subject to such potential liability. The § 4-205 stamp merely allows the depositary bank to forward the check secure that the final payment rule will protect it against forged check claims. It remains liable for the risk that it is not dealing with the true payee
 
 
 [33]
 Citizens & Southern National Bank v. American Surety Co., 347 F.2d 18 (5th Cir. 1965), does not require that Perini be permitted restitutionary recovery from Habersham or Fulton. In Citizens & Southern the malefactor stole a company check prepared to the order of Higgins but not yet signed. The thief forged the drawer's and Higgins's signatures. The depositary bank credited the account maintained by the real Higgins, forwarded the check to the drawee bank, and subsequently allowed the thief to draw the funds out of Higgins's account by forging his signature
 This court held that the depositary bank paid the second check, drawn on Higgins's account at the bank, out of its own funds because it was then acting as a drawee bank which is bound to know its customer's signature and pay to his order. Therefore the proceeds of the first forgery were deemed to have remained in Higgins's account, so that Higgins was entitled to them. The court allowed the plaintiff bonding company restitution as assignee of Higgins and the drawee of the first check.
 In the case at bar Habersham cannot be charged with having paid funds out of the contracting companies' accounts contrary to the order of its depositors. There is no indication of a true Southern Contracting Co. or Quisenberry Contracting Co. which, like Higgins, could claim a loss or be subjected to liability in the transactions before us. Accordingly, Perini cannot claim that its funds are still in the hands of the collecting banks.
 We recognize that the pre-Code decision in Citizens & Southern noted that the Code would "arguably" place double forgery liability on collecting banks rather than the drawee. 347 F.2d at 22, n. 4. We have explained earlier our understanding that such predictions of the Code's effect on double forgery problems have proved vulnerable. See Part III. C.2, supra.
 
 
 [34]
 Under § 1-201(27), an individual conducting a particular transaction for an organization has notice of information received elsewhere in the organization from the time that the organization would have communicated it to him in the exercise of due diligence