871 A.2d 110 (2005)
376 N.J. Super. 520
LOR-MAR/TOTO, INC., Plaintiff-Respondent,
v.
1ST CONSTITUTION BANK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2005.
Decided April 18, 2005.
*111 Gregg S. Sodini, Iselin, argued the cause for appellant (Sodini & Spina, attorneys; Mr. Sodini and Syreeta L. Carrington, on the brief).
Marco Benucci, Warren, argued the cause for respondent (Richard M. Sasso, attorney; Mr. Sasso, on the brief).
Before Judges NEWMAN, AXELRAD, and HOLSTON, JR.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
This appeal involves the liability of a bank to its customer for paying on forged checks chargeable to the customer's account. The bank argued it was not liable for honoring the checks because they contained a facsimile signature resembling the specimen on file, which signature was binding on its customer. The court concluded, in the absence of the customer's negligence and where it reported the forgery within the statutorily required time after it received its bank statements, the checks were not "properly payable" within Section 4 of the Uniform Commercial Code ("UCC"), and thus the bank could not charge the amounts of the forged checks to its customer's account. On cross-motions, the court entered summary judgment in favor of the customer. We affirm.
Plaintiff, Lor-Mar/Toto, Inc. ("Lor-Mar"), a customer of defendant, 1st Constitution Bank ("Bank"), maintained a business checking account at the Bank numbered "XXXXXXXXXX." The corporate banking resolution ("Resolution") between plaintiff and the Bank provided that checks drawn on plaintiff's checking account could be honored upon one authorized signature of the four named officers or employees of plaintiff stated in the Resolution, which included Loretta A. Van Middlesworth and Louis J. Toto, Jr., its president and vice-president respectively.[1] On May 28, 1997, plaintiff notified the Bank that the signatures of Van Middlesworth and Toto would be "stamped" on plaintiff's checks and provided the Bank with samples of their stamped facsimile signatures. Thus, from May 1997 forward, the Bank was authorized by plaintiff to honor checks bearing a stamped facsimile signature of either Van Middlesworth or Toto.
*112 Beginning on June 19, 2002, a series of five allegedly unauthorized checks were drawn against plaintiff's account:

Date Check No. Amount Payee Date Posted
June 19, 2002 6443 $4900 Ali Aydin June 24
June 20, 2002 6482 $9750 Deniz Erdogan June 24
June 21, 2002 6481 $3700 Ali Aydin June 24
June 25, 2002 6572 $1200 Seyda Sengul July 3
June 27, 2002 6570 $4800 Seyda Sengul July 1

The total sum of the unauthorized checks equaled $24,350.00. All five checks bore what appears to be the stamped facsimile signature of Van Middlesworth as was provided to the Bank on May 28, 1997, and another signature which is illegible. However, the unauthorized checks were a different stock and color than plaintiff's regular checks. More particularly, based on our review and comparison at oral argument of samples of plaintiff's authentic checks issued during the same time period and the subject checks contained in the trial record, we noted that the former were light yellow in color and the type routinely purchased from banks. On the front, under the preprinted check number, they contained a numerical bank designation of "55-715/212 01." The back of the checks contained a repetitive pattern and the words "ORIGINAL DOCUMENT" with a security message at the bottom stating: "IMPORTANT: The back of this document has been printed with a patented security process in order to deter check fraud. If you do not clearly see the words `Original Document' and the Security Weave pattern, or the word VOID appears to the right of this message, do not cash."[2] The sample checks contained the stamped facsimile signature of Toto and the actual signature of another corporate signatory, Maureen E. Zaleck. In comparison, the challenged checks were computer-generated and laser-printed on light blue paper and contained no bank designation number under the preprinted check number. Their purported security features are different from the legitimate checks; they contain the words "ORIGINAL DOCUMENT" in large letters once on the back with a boxed designation:
THIS DOCUMENT INCLUDES THE FOLLOWING VALUGUARD SECURITY FEATURES; EXCEEDING FSA GUIDELINES:
 INVISIBLE FLUORESCENT FIBERS
 TWO SOLVENT STAINS
 BROWNSTAIN
 UV DULL
ATTEMPTS TO COPY OR CHEMICALLY ALTER THIS DOCUMENT

*113 WILL ACTIVATE VALUGUARD SECURITY FEATURES.
Significantly, these unauthorized checks contain repeated duplicate numbers from legitimate checks that had already been issued by plaintiff:

Date Check No. Amount Payee Date Posted
May 31, 2002 6443 $2490 Gino's Trucking June 5
June 6, 2002 6482 $3056 Dave's Excavating June 12
June 6, 2002 6481 $3290 CAS Contracting June 12
June 28, 2002 6572 $4905.71 Komatsu Financial July 3
June 28, 2002 6570 $ 584.63 Binder Machinery July 3

The Bank's threshold amount for a manual review of individual checks is $5,000. The Bank did not conduct a manual review of four of the checks below the threshold, and honored all five checks and charged plaintiff's account accordingly. The five checks were debited to plaintiff's account from June 24 to July l, 2002 and appeared on plaintiff's statements covering the periods May 31, 2002 through June 28, 2002, and June 28, 2002 through July 31, 2002. Upon reviewing the statements, plaintiff discovered and reported the unauthorized charges to the Bank in July 2002. For each of the five checks, Toto executed an "Affidavit For Forged or Lost Check/Money Order" to the Bank attesting that he never signed his name on the check, authorized any person to endorse his name, the endorsement of his name that appears on the check is a forgery and he never received any of the funds the check represented. Although no explanation was provided for the lack of an affidavit by Van Middlesworth, there are no allegations by the Bank of negligence on her part regarding her stamp or any involvement in the issuance of the challenged checks. Therefore, we can assume the forger produced the checks without making unauthorized use of Van Middlesworth's facsimile stamp or any other facilities under the control of the actual drawer and produced the counterfeit checks and reproduced Van Middlesworth's signature using modern desktop publishing technology with a genuine check of Lor-Mar as a model. Plaintiff filed a complaint with the state police but its investigation was unsuccessful. Plaintiff believed the incident was part of a string of forgeries in the central New Jersey area which remained unsolved.
Of the five checks at issue, two were presented and deposited into accounts maintained at First Union Bank and Fleet National Bank. Although the Bank disputed liability to plaintiff, it contacted both First Union Bank and Fleet National Bank in an effort to recover the funds paid on the unauthorized checks from the accounts at these financial institutions into which they were deposited. The Bank was successful in recovering $8,990.15, and forwarded to plaintiff checks in the amounts of $5,758.36 on August 12, 2002 and $3,231.79 on September 5, 2002. Plaintiff filed suit to recover the balance due on the forged checks that had been charged to its account in the amount of $15,359.85, plus interest and costs.
The parties filed cross-motions for summary judgment. Plaintiff contended that the Bank should have noticed the challenged checks drawn on the account were different and contained security features inconsistent with those that appeared on checks used in plaintiff's regular course of business, and they contained duplicate numbers to authentic checks previously issued by plaintiff several weeks prior which presumably had already cleared the account. Accordingly, pursuant to N.J.S.A. *114 12A:4-401, the checks were not "properly payable" and they should not have been honored by the Bank.
The Bank contended it exercised reasonable commercial standards in paying the checks. According to the Bank, there was an express contractual arrangement that it pay on the stamped facsimile signatures of either Van Middlesworth or Toto. The Bank claimed it did exactly as it had been authorized by plaintiff. The Bank presented a certification of Kevin Rowinsky, its vice-president and auditor, opining that the checks did not bear "any apparent evidence of any forgery and are not so irregular as to call into question their authenticity." Rowinsky further stated:
1st Constitution's threshold amount for pulling individual checks and manually reviewing them is $5,000.00. This amount does not vary unreasonably from general banking usage and is in fact lower than that of most banking institutions in New Jersey. Only one of the checks met this threshold amount to be manually reviewed prior to payment. Based upon that review, the check was paid as there was nothing irregular about the check which contained the facsimile signature of Loretta A. Van Middlesworth. In addition, all of the other checks also contained the same facsimile signature of Ms. Van Middlesworth such that even if the other checks had been pulled and reviewed, they would also have been paid. In sum, 1st Constitution paid the checks in good faith and in accordance with the reasonable commercial standards applicable to the banking industry without any knowledge that any of the signatures were unauthorized or otherwise fraudulent.
The fact that the checks at issue here were a different color, size and stock than those of other Lor-Mar checks is of no consequence in connection with the processing of checks for payment. Specifically, customers are able to purchase different styles of checks from any number of different sources and a bank would have no reason to question this or refuse payment on this basis.
The court granted plaintiff's motion for summary judgment, memorialized in a May 14, 2004 memorandum and a June 10, 2004 order. The court found that a bank that pays a check bearing the forged signature of its depositor "whether it is stamped, faxed or actually signed," where the depositor notified the bank of the forgery within the statutorily required time, cannot charge the forged check to the depositor's account.
On appeal, the Bank reasserts that it is not liable to plaintiff for honoring the five checks as Van Middlesworth's stamped facsimile signature is binding upon plaintiff and presumed valid based on the customer's prior authorization. Additionally, the customer's account agreement authorized the Bank to honor checks bearing the signature of either Van Middlesworth or Toto. The Bank also contends it followed reasonable commercial standards in paying the checks. The Bank asserts it had no duty to review the checks prior to payment because they were not so irregular nor did they contain apparent evidence of forgery so as to warrant manual verification, and only one of the checks exceeded the Bank's $5,000 threshold amount for manual verification. The crux of the Bank's argument is that a customer who chooses to use a stamped facsimile signature bears the risk of loss for a forged check.
The UCC specifies, in pertinent part, when a bank may charge its customer's account:
a. A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. *115 An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank.
b. A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefited from the proceeds of the item.
[N.J.S.A. 12A:4-401.]
Thus an instrument is "properly payable" if it is authorized by the customer and is in accordance with any agreement between the customer and bank. N.J.S.A. 12A:4-401a. An item presented for payment is only "properly payable" if it is properly signed or adopted "with a present intention to authenticate [the] writing." N.J.S.A. 12A:3-401b. Since the holding of the "intent" must be considered delegated to the individual authorized to apply the stamp, any use by unauthorized personnel would create an unauthorized signature. 5 William D. Hawkland, Uniform Commercial Code Series § 4-401:2 (2002).
An instrument, however, is not properly payable if it contains a forged drawer's signature or forged endorsement. N.J.S.A. 12A:4-401, UCC Comment l; Travelers Indem. Co. v. Good, 325 N.J.Super. 16, 21, 737 A.2d 690 (App.Div.1999). See also 2 James J. White & Robert S. Summers, Uniform Commercial Code § 21-3 at 363 (4th ed. 1995) ("Absent customer's ratification or negligence, pre-Code and post-Code cases hold that these checks are not `properly payable' and that the bank must recredit the customer's account when it pays these checks. By analogy, section 3-401(a) supports this result, for it states [in relevant part] that a person is not liable on an instrument unless the person signed the instrument....").
The bank's duty to charge its customer's account only for "properly payable" items under N.J.S.A. 12A:4-401 imposes standards of strict liability. See Perini Corp. v. First Nat'l Bank of Habersham County, 553 F.2d 398, 404-405 (5th Cir.1977) (Since the "forgery does not operate as the ostensible drawer's signature," § 3-404(1), any payment on such an instrument "is not to the ostensible drawer's order and violates the drawee bank's strict duty to charge its customer's account only for properly payable items.").
Fault occupies a secondary role in the treatment of UCC forgery losses. Id. at 405. The exception under the UCC where losses may be allocated by a comparative negligence test between the customer and the bank is not implicated in this case, as there is no allegation of negligence by the customer contributing to the making of the forged signature, N.J.S.A. 12A:3-406,[3] or a failure to promptly examine the bank statements and report the unauthorized signature and counterfeit checks to the Bank, N.J.S.A. 12A:4-406.[4] Thus an analysis of whether the Bank exercised "ordinary care" in paying the instrument, as utilized in sections 3-406 and 4-406, is not relevant to the inquiry on appeal.
*116 Our focus is whether the fraudulent checks were authorized by Lor-Mar and in accordance with any agreement between the customer and Bank, N.J.S.A. 12A:4-401a. Through no negligence on the part of the customer, Van Middlesworth's stamped signature was identically duplicated on computer-generated checks. The Bank asserts the signatures of Van Middlesworth are presumed valid and enforceable and plaintiff has not made a sufficient showing to rebut the presumption of validity, relying on Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 86, 777 A.2d 993 (App.Div.2001) (holding the purported issuer of dishonored payroll checks with facsimile signatures failed to provide sufficient evidence of the invalidity of its signature under N.J.S.A. 12A:3-308, so as to defeat holder in due course status to an assignee who purchased the checks from a check cashing company where it was not apparent on the face of the checks they were fraudulent). The Bank further argues that by express contractual agreement and specific instructions from Lor-Mar, it was authorized to honor each of the checks which purported to contain an authorized facsimile signature.
Lor-Mar urges us to rely on Triffin v. Pomerantz Staffing Services, LLC, 370 N.J.Super. 301, 851 A.2d 100 (App.Div.2004), where we found against the assignee, a claimed holder in due course, and in favor of the purported issuer of dishonored checks, whose check stock was imitated and whose facsimile signature was forged. In Pomerantz we distinguished Somerset Valley as the undisputed evidence in Pomerantz indicated the checks were counterfeit and appeared to be so when presented to plaintiff's assignor so the burden shifted to its assignee to show the signatures were valid. Id. at 308, 851 A.2d 100. In Pomerantz, we further concluded that the forged signature could not convey the intention of the drawer to authenticate the writing, N.J.S.A. 12A:3-401b. Id. at 305, 851 A.2d 100.
Lor-Mar asserts that although Van Middlesworth's signature on the fraudulent checks resembles the specimen on file, her signature was unauthorized as she did not have the present intention to authenticate the counterfeit checks by stamping them, allowing her facsimile signature to be stamped on them, or authorizing reproduction of her signature. Accordingly, the challenged checks were not "properly payable." N.J.S.A. 12A:4-40l; See also N.J.S.A. 12A:1-201(43) (An "`unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery."). Nor was there an agreement with the Bank to honor an unauthorized reproduction of her signature or shift the risk of loss caused by forgery to Lor-Mar.
Procedurally, we are satisfied Lor-Mar presented sufficient evidence of the invalidity of Van Middlesworth's reproduced facsimile signature on the counterfeit computer-generated checks. We note that the status and rights of the parties in the two Triffin cases are different from the present case. They involve the claims of a holder in due course against the issuer who had stopped payment on purportedly forged checks and are governed by Article 3 of the UCC, which includes a specific provision pertaining to the burden of establishing the validity of a signature. See N.J.S.A. 12A:3-308a. The present case involves a dispute between a bank and its customer for paying on forged checks chargeable to the customer's account, which relationship is governed by Article 4 of the UCC. Regardless, the Bank does not really dispute that Van Middlesworth's facsimile signature on the challenged checks is a forgery; its defense is that it is entitled to charge Lor-Mar's account for the checks it paid based on the parties' *117 contractual agreement to honor a facsimile signature resembling the specimen supplied by the customer.
Several courts throughout the country have grappled with a bank's liability to its customer for paying on forged checks pursuant to an authorizing corporate resolution to honor facsimile signatures. In Perini, supra, 553 F.2d at 401, an unknown person stole a number of the customer's preprinted checks and gained access to the signature machine or developed a perfect copy of the machine-embossed facsimile signature it produced, and issued those checks to a probably fictitious payee. The Fifth Circuit held, in relevant part, there was no cause of action for recovery against the bank for funds paid on the forged checks where the drawer had adopted a resolution authorizing and directing the bank to honor all of its checks "when bearing or purporting to bear the single facsimile signature of [a specified person]" and "be entitled to honor and charge [the customer] for all such checks, ... regardless of by whom or by what means the actual or purported facsimile signature thereon may have been affixed thereto, if such facsimile signature resembles the facsimile specimen from time to time filed with said banks...." Id. at 400. The court reasoned that "this assumption of risk was the price [the customer] undertook to pay, voluntarily and at arms length, for the convenience of the facsimile signature machine." Ibid.
Similarly, in Jefferson Parish School Bd. v. First Commerce Corp., 669 So.2d 1298, 1299-301 (La.Ct.App.1996), citing to Perini, the court held that under a facsimile signature resolution between the bank and its customer authorizing the bank to pay any check drawn on the customer's facsimile machine, the bank was not liable for payment of counterfeit facsimile checks so long as the signatures were nearly identical to the facsimile specimens submitted by the customer. As in the present case, various instruments purporting to be checks made by the customer drawn on its account at defendant bank were presented for payment and paid by the bank. Id. at 1299. Upon receiving the monthly bank statement, the customer observed the instruments to be counterfeit, reported it to the bank, and executed an affidavit of forgery. Ibid. The critical difference between that case and the present one, however, is that the customer, Jefferson Parish School Board, had executed a resolution providing in clear and unambiguous terms that the bank was authorized to honor "all checks" "purporting to bear" the facsimile signatures, "regardless of by what means" the actual or purported signature was affixed as long as the "signatures resemble[d] the facsimile specimens" filed with the bank by the appropriate corporate officer. Id. at 1300. The resolution expressly shifted the risk of loss to the customer, providing:
[t]hat the said bank may rely on these resolutions until the receipt by the Bank of a certified copy of a resolution by the Board of Directors of this Corporation revoking the same, this Corporation expressly assuming all risks involved in any unauthorized use of such facsimile signature and agreeing that this Corporation shall be responsible for and chargeable with the amount of all checks, drafts, or other orders bearing such facsimile signature or signatures resembling the same, whether or not placed thereon by the authority of this Corporation.
[Ibid. (emphasis omitted)].
The court was satisfied that the contract comported with Louisiana's UCC statute, LSA-R.S. 10:4-103(1), which permits the parties to vary the provisions of the chapter except that "no agreement can disclaim *118 a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or ... limit the measure of damages for such lack of failure; but the parties may agree to determine the standards by which such responsibility is to be measured if those standards are not manifestly unreasonable." Ibid. (emphasis omitted).
In Arkwright Mutual Ins. Co. v. Nationsbank, N.A. (South), 212 F.3d 1224 (11th Cir.2000), opinion withdrawn by, 251 F.3d 918 (11th Cir.2001),[5] suit was filed to require a bank to credit its customer's account for payment of counterfeit checks created by a forger on the customer's account. The court held the banking contract shifted the risk for loss by forgery to the customer because the bank allowed the customer to use a facsimile signature machine and instructed the bank to accept, honor, and pay all checks "bearing or purporting to bear" the facsimile signature of the customer's authorized representative. Id. at 1225-26. Relevant portions of the deposit agreement provided:

Facsimile Signatures: If your items are signed using any facsimile signature or non-manual form of signature, you acknowledge that it is solely for your benefit and convenience. You accept sole responsibility for maintaining security over any device affixing the signature. Such signature will be effective as your signature regardless of whether the person affixing it was authorized to do so.
[Id. at 1227].
The record, however, was not sufficiently developed to allow the court to decide the issue of whether the bank acted with ordinary care when it processed the forged checks. Id. at 1230-31.
Other states have enforced these clear and unambiguous risk-shifting agreements against the customer under similar circumstances. See, e.g., Wilmington Trust Co. v. Phoenix Steel Corp., 273 A.2d 266 (Del.1971) (a pre-Code case); Wall v. Hamilton County Bank of Jasper, 276 So.2d 182 (Fla.Dist.Ct.App.1973); Phoenix Die Casting Co. v. Manufacturers and Traders Trust Co., 29 A.D.2d 467, 289 N.Y.S.2d 254 (1968) (a post-Code case). Cf. Cumis Ins. Society, Inc. v. Girard Bank, 522 F.Supp. 414 (E.D.Pa.1981) (The court found the resolution was insufficient to relieve the bank from liability under Pennsylvania law because the resolution was an exculpatory clause that had to be strictly construed against the bank.).
New Jersey has adopted language identical to Louisiana's and Florida's UCC statute. N.J.S.A. 12A:4-103, L. 1995, c. 28, § 2. The comments to this provision of our statute recognize the necessity for flexibility in entering into risk-shifting agreements in view of constantly evolving banking practices provided the bank does not attempt to disclaim its statutory duties of good faith and ordinary care:
[I]n view of the technical complexity of the field of bank collections, the enormous number of items handled by banks, the certainty that there will be variations from the normal in each day's work in each bank, the certainty of changing conditions and the possibility of developing improved methods of collection to speed the process, it would be unwise to freeze present methods of operation by mandatory statutory rules. This section, therefore, permits within wide limits variation of the effect of provisions of the Article by agreement.
[N.J.S.A. 12A:4-103, UCC Comment l.]
Subsection (a) confers blanket power to vary all provisions of the Article by agreements of the ordinary kind. The agreements may not disclaim a bank's *119 responsibility for its own lack of good faith or failure to exercise ordinary care and may not limit the measure of damages for the lack of failure, but this subsection ... approves the practice of parties determining by agreement the standards by which the responsibility is to be measured. In the absence of a showing that the standards manifestly are unreasonable, the agreement controls....
[N.J.S.A. 12A:4-103, UCC Comment 2].
In the case before us, however, although there was an agreement between the parties for the Bank to honor checks with Van Middlesworth's facsimile signature, Lor-Mar did not "authorize" these five counterfeit checks within the meaning of the UCC, and the parties did not execute a clear and unequivocal agreement varying their obligations under N.J.S.A. 12A:4-401 and shifting the risk of loss for forged facsimile signatures to the customer.[6]
Lor-Mar's officers signed a resolution which we will assume was properly attested and executed when the account was opened on December 23, 1996. The resolution contains no mention of facsimile signatures. The document provides in relevant part:
[The Bank] is designated as the Financial Institution of and depository for the funds of [Lor-Mar], which may be withdrawn on checks ... bearing the following appropriate number of signatures: Any one (1) of the following names officers or employees of this Corporation ("Agents"), whose actual signatures are shown below:

[The signatures of Van Middlesworth, Toto and two other authorized representatives appear above their typewritten names and titles.]
...
FURTHER RESOLVED, that the [Bank] is hereby directed to accept and pay without further inquiry any item drawn against any of [Lor-Mar's] accounts with [the Bank] bearing the signature or signatures of Agents, as authorized above or otherwise....
[Emphasis added].
The four authorized representatives also signed a signature card. A facsimile cover sheet was sent to the Bank's representative from "Loretta" [Van Middlesworth] dated May 28, 1997 stating: "Dear Jeanie, The following signatures are being stamped for Lor-Mar/Toto, Inc., the samples are below. [stamped signatures of Van Middlesworth and Toto] Note: Maureen and Mark [the two other authorized signatories] will be signing their own signatures not stamped."
The UCC as adopted by New Jersey permits a bank and its customer to modify the bank's strict liability under Section 4-401, and shift the risk of loss to the customer, provided the bank does not attempt to disclaim its statutory duty of good faith. See N.J.S.A. 12A:4-103 and comments. Thus, the parties can agree for the bank to honor and charge its customer for all checks bearing a facsimile signature resembling the specimen on file even if it is created by a forgery or the stamp is affixed by an unauthorized person. Such a risk-shifting agreement, however, must contain clear and unambiguous language defining the scope of the bank's obligation, identifying the customer's responsibility, and expressly shifting the risk of loss to the customer for a forged facsimile signature resembling the specimen on *120 file. That did not occur here. Such an intent is not clearly stated in the documents. The sole document executed by Lor-Mar's representative pertaining to facsimile signatures is a facsimile cover sheet which just contains an imprint of the two stamped signatures. Even when that paper is read with the previously executed Resolution, the Bank is only authorized to honor a check bearing Van Middlesworth's or Toto's stamped signature. Lor-Mar did not expressly recognize and assume all risks involved in the unauthorized use of its officer's facsimile signature. Accordingly, there was no meeting of the minds between the Bank and its customer as to a modification of the Bank's responsibilities and its customer's rights under Section 4-401.
"The relation between a depositor and a bank is one of creditor and debtor, and their rights and liabilities depend upon the contract between them." Forbes v. First Camden Nat'l. Bank & Trust Co., 25 N.J.Super. 17, 20-21, 95 A.2d 416 (App.Div.1953). If there is any ambiguity in the resolution, it must be construed against the bank as the drafter of the document. New York State Higher Educ. Servs. Corp. v. Lucianna, 284 N.J.Super. 603, 608, 666 A.2d 173 (App.Div.1995); Buscaglia v. Owens-Corning Fiberglas, 68 N.J.Super. 508, 519-20, 172 A.2d 703 (1961), aff'd, 36 N.J. 532, 178 A.2d 208 (1962); Forbes, supra, 25 N.J.Super. at 21, 95 A.2d 416. Waiver presupposes a full knowledge of the right and an intentional surrender. G.E. Capital Mortgage Servs., Inc. v. Marilao, 352 N.J.Super. 274, 281, 800 A.2d 150 (App.Div.2002). "It is requisite to waiver of a legal right that there be `a clear, unequivocal, and decisive act of the party showing such a purpose....'" Ibid. (internal citation omitted).
Accordingly, the Bank is held to strict liability to Lor-Mar under N.J.S.A. 12A:4-401. As the forged checks were not authorized under Section 4-401, they are not "properly payable" by the Bank. Accordingly, they are not chargeable to Lor-Mar's account, so summary judgment was properly granted in favor of the customer on its collection case against the Bank.
We note that the issue of the Bank's ordinary care in processing the forged checks, N.J.S.A. 12A:3-103a(7), is not implicated here as there is no claim of negligence on the part of the customer nor any agreement between the parties to shift the risk of loss to the customer for the forged facsimile signature. Therefore, we need not reach the issue of whether the alleged irregularities in the checks should have raised a "red flag" and whether the Bank's manual verification procedure certified to by its vice-president/auditor is in accordance with reasonable commercial standards.
Affirmed.
NOTES
[1] The Resolution provided in the Bank's appendix is unattested and undated. The corporate signature card indicates "date opened 12-23-96." We assume the Resolution was executed at that time.
[2] Additionally, we observed the following differences in the checks: All of the information filled in on the sample authentic checks such as the date, payee and amount is handwritten, with the date, for example, listed as "May 31, 02." There is also an explanation of the charge or reference to a specific invoice number on each of the checks. All of the information on two of the challenged checks is computer-generated and on three is hand-written. The date is designated numerically, for example, as "06/25/2002" or "6-19-2002." There is no explanation of the charge or reference to an invoice number. As there were no proofs that all of these aspects of the sample checks are consistent with plaintiff's regular course of business, we note these observed discrepancies with the challenged checks for informational purposes only and not as evidence of irregularities that arguably should have been observed by the Bank.
[3] N.J.S.A. 12A:3-406 bars recovery against a bank by one whose negligence substantially contributes to a material alteration of an instrument or the making of an unauthorized signature as against the drawee, providing the drawee acts in good faith in accordance with exercising ordinary care, i.e., the reasonable commercial standards of its business. See also N.J.S.A. 12A:3-406, UCC Comment 1.
[4] N.J.S.A. 12A:4-406 bars recovery against a bank by a customer who fails to comply with its statutory duty to exercise reasonable promptness in examining its bank statement to discover any unauthorized signature or any alteration and to promptly notify the bank, if the customer should have reasonably discovered the unauthorized signature or the alteration, and the bank subsequently suffered a loss.
[5] Published opinion withdrawn based on settlement of parties.
[6] At oral argument, the Bank's counsel stated that in other instances the Bank has obtained voluntary waiver agreements shifting the loss to the customer for forged facsimile signatures.